**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

---

Civil Action No. 13-cv-03422

---

ARAPAHOE SURGERY CENTER, LLC,
et al.,

Plaintiffs,

v.

CIGNA HEALTHCARE, INC., et al.,

Defendants.

---

**CIGNA'S MOTION TO DISMISS**
**COUNTS VI AND VII OF PLAINTIFFS' COMPLAINT**

---

Defendants Cigna Healthcare, Inc., Cigna Healthcare of Colorado, Inc., and Connecticut General Life Insurance, Co. (collectively, "Cigna") hereby bring this Motion to Dismiss Counts VI and VII of the Complaint filed by Arapahoe Surgery Center, LLC, Cherry Creek Surgery Center, LLC, Hampden Surgery Center, LLC, Kissing Camels Surgery Center, LLC, SurgCenter of Bel Air, LLC, and Westminster Surgery Center, LLC (collectively these ambulatory surgery centers are referred to as the "ASCs"), pursuant to Fed. R. Civ. P. 12(b)(6).

Pursuant to D.C.COLO.L.CivR 7 and WJM Revised Practice Standard III.D, counsel for Cigna discussed the substance of this motion with counsel for the ASCs. The ASCs oppose the relief that Cigna requests. Based upon the nature of the

Complaint's defects and the ASCs' opposition, the undersigned do not believe that the deficiencies in the allegations can be corrected by amendment.

## PRELIMINARY STATEMENT

The ASCs' Complaint admits that they are engaged in an illegal practice known as fee forgiving. Specifically, they admit that they lure potential patients to their out-of-network facilities by charging them co-insurance and deductible payments no higher than the amounts the patients would have paid if they visited medical facilities within Cigna's provider network, while at the same time billing Cigna out-of-network rates that are often many times higher than the rates charged by in-network facilities.

By waiving patient's co-insurance and deductible requirements in this manner, the ASCs have unlawfully collected millions of dollars in out-of-network benefits that should never have been paid pursuant to the terms of Cigna's ERISA-governed health plans. The ASCs have also violated Colorado law, which expressly forbids health care providers from waiving co-insurance and deductible payments.

The ASCs now contend that the actions Cigna took to protect itself from this illegal fee-forgiving scheme somehow violated the antitrust laws. But their claims are implausible on their face because it is readily apparent from the ASCs' own allegations that Cigna acted based on its independent self-interest to shield itself from the ASCs' unlawful business practices, not because it reached an illicit agreement with anyone.

Because the ASCs' claim of an antitrust violation is so implausible, it is not surprising that they cannot plead the most basic element of such a claim, that Cigna reached an agreement with its alleged co-conspirators. The ASCs plead that Cigna

communicated with its alleged co-conspirators and "participated in a meeting" in August 2012 during which the antitrust conspiracy was allegedly formed. But they stop short of alleging that anyone at Cigna actually agreed to anything at this meeting, and for good reason, given that according to the ASCs' own allegations, Cigna's actions in furtherance of the purported conspiracy began in December 2011, long before the meeting or any alleged agreement ever took place. The ASCs similarly fail to allege anything about the parties that actually agreed to the conspiracy, the market power of the alleged conspirators, or the relevant market that the alleged conspiracy affected. Accordingly, the ASCs' antitrust claims should be dismissed.

## I. BACKGROUND

To help manage health care costs, Cigna-administered health plans incentivize members to use Cigna's network of healthcare providers, who have agreed to accept discounted rates for their services in exchange for receiving access to Cigna's customers. (Compl. ¶¶ 32-34); *see also Ky. Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329, 332 (2003) (provider networks "control[] the quality and cost of health-care delivery"). Accordingly, Cigna-administered plans generally provide that members will be responsible for lower co-insurance and deductible payments if they see network providers rather than out-of-network providers. (*Cf.* Compl. ¶ 6 ("In order to enable CIGNA patients to use their out-of-network benefits at the facility of their choice at affordable rates, [the ASCs] reduce patients' co-pays, deductibles, and co-insurance amounts to in-network levels.").) The higher cost-sharing payments required for out-of-network services encourage the use of less costly network providers, and also serve as

a check on the ability of out-of-network providers to charge astronomical rates for their services because when patients are required to pay a percentage of their out-of-network providers' charges as co-insurance, they generally avoid seeking treatment at out-of-network providers with inflated rates.

The ASCs are out-of-network ambulatory surgery facilities that tried to skirt these fundamental cost controls by charging two different prices for their services: one to their patients and another to their patients' health insurance plans. Specifically, the ASCs lure patients by charging them "co-pays, deductibles, and co-insurance amounts [at] in-network levels." (*Id*. ¶ 6.) At the same time, the ASCs bill Cigna at their unreduced out-of-network rates, which are much higher than the in-network rates on which they based the member responsibility of Cigna's customers. (*Id*. ¶ 17 (admitting that in-network hospitals "are paid ***much lower*** in-network rates" than the ASCs) (emphasis added); *id*. ¶ 34 (acknowledging that Cigna "pays ***far less***" reimbursing in-network claims than out-of-network claims) (emphasis added).) This practice—in which a provider submits charges to a member's plan but waives collection of all or some of the member's cost-sharing responsibility—is called "cost share waiver" or "fee-forgiving."[1]

---

[1] While the ASCs insist that their patients "remain responsible for the full amount of the charges if CIGNA does not pay or drastically reduces payments on the medical claims," they allege no instance in which they actually attempted to collect from their patients despite alleging that Cigna informed them of its intent to deny or reduce their claims as early as Spring 2011. (Compl. ¶¶ 6, 83-84.) Moreover, given that the ASCs premise their business model on attracting patients by promising out-of-network services at reduced in-network rates (*id*. ¶ 6), it is implausible that they ever intended to collect the full amount of their bills from Cigna's members. Indeed, the Seventh Circuit has already rejected the viability of this argument. *See Kennedy v. Conn. Gen. Life Ins. Co.*, 924 F.2d 698, 701-02 (7th Cir. 1991) (finding that provider could not require member to pay his coinsurance amount only if the plan failed to pay its portion of the provider's

The ASCs' fee-forgiving business model completely undermines the cost-control measures set forth in Cigna-administered plans. By waiving a patient's higher out-of-network costs while still charging Cigna undiscounted, out-of-network rates, the ASCs take away any incentive that their patients have to see network providers, and remove a critical check on their ability to charge astronomical rates for their services.

Not surprisingly, court after court has recognized the legitimate interests in preventing fee-forgiving schemes.[2] For example, in *Kennedy v. Connecticut General Life Insurance Co.*, 924 F.2d 698 (7th Cir. 1991), the Seventh Circuit examined a Cigna plan that required the member to pay 20% co-insurance and provided that "[n]o payment will be made for expenses incurred . . . for charges which the Employee or

---

charges, because this creates a "delicious circularity," and the court "could not break the circle in favor of reimbursement without abrogating the [plan's] co-payment requirement—a requirement that [the plan] had every legal entitlement to create.").

[2] *See Biomed Pharmaceuticals, Inc. v. Oxford Health Plans (NY), Inc.*, No. 12-3023, 2013 WL 2991293, at *1 (2d Cir. 2013) (where provider "routinely" waived patients' "deductible and coinsurance obligations," "it was reasonable for [insurer] to pay a reduced amount"); *Smilecare Dental Grp. v. Delta Dental Plan of Cali.,* 88 F.3d 780, 786 (9th Cir. 1996) (affirming dismissal of Sherman Act claim contesting plan's refusal to accept payments from supplemental insurers in lieu of co-payments from patients because "[plan]'s policy is supported as a matter of law by a legitimate business justification–its interest in protecting the disciplinary effect of its co-payment plan"); *Davidowitz v. Delta Dental Plan of Cali., Inc.*, 946 F.2d 1476, 1479 (9th Cir. 1991) (cost-sharing "waivers annul the benefits of the co-payment system"); *N. Cypress Med. Ctr. Operating Co. v. CIGNA Healthcare*, No. 09-cv-2556, slip op. at 13 (S.D. Tex. Aug. 10, 2012) (interpreting Cigna's plans to bar ERISA benefits claims where provider forgave member's cost-sharing responsibility; noting that "any alternative reading would result in significant and unanticipated costs to the ERISA plans"); *Wellness Aerobic & Sports Med. Clinic, Inc. v. Metra Health*, 98-cv-2454, 1999 WL 118013, at *2 n.2 (E.D. La. Mar. 3, 1999) (noting that plan "requires participants to pay co-payments and deductibles which cannot be waived," and "any other interpretation of the plan would result in unanticipated costs to the plan to cover expenses that are not covered by the [plan]").

Dependent is not legally required to pay." *Id*. at 701. The provider plaintiff waived the member's co-insurance payment but billed Cigna for his full charges; as a result, the Seventh Circuit found that the provider misstated his actual charges. *Id*. The court thus affirmed Cigna's right to deny payment for the provider's charges, explaining that the "[patient]'s plan and CIGNA's policy require co-payments in order to maintain incentives that hold down the cost of medical care," and "its terms will be enforced." *Id*. at 702.

The ASCs try to excuse their fee-forgiving by arguing that they want to make their charges "affordable" to Cigna's customers. (Compl. ¶ 6.) The clear implication, of course, is that their out-of-network rates—that is, the amounts the ASCs argue Cigna should pay—are not affordable. As courts like *Kennedy* make clear, such practices have a perverse effect on healthcare insurance, ultimately making coverage more expensive for everyone. Indeed, Colorado law prohibits the fee-forgiving practices that the ASCs admit that they engage. Colo. Rev. Stat. § 18-13-119 (2012) (prohibiting billing practices that "have the effect of eliminating the need for actual payment by the recipient of health care of required copayments and deductibles in health benefit plans").

## II. LEGAL STANDARD.

To state a claim under either Section 1 of the Sherman Act (Count VI) or the Colorado Antitrust Act (Count VII), the Colorado ASCs must plead facts that show Cigna entered into "a contract, combination or conspiracy that unreasonably restrains trade in the relevant market." *See TV Commc'ns Network, Inc. v. Turner Network Television, Inc.* ("*TVCN*"), 964 F.2d 1022, 1027 (10th Cir. 1992); *Four Corners Nephrology Assocs. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1219 n.1 (10th Cir. 2009) (analyzing

federal and state antitrust claims "collectively and with attention to federal precedents"); Colo. Rev. Stat. § 6-4-119 (2012) ("[C]ourts shall use as a guide interpretations given by the federal courts to comparable federal antitrust laws.").

Rule 12(b)(6) dismissal is appropriate where the Complaint fails to offer factual allegations as to each of these three elements sufficient to make the ASCs' claims plausible on their face. *See Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Enforcing these pleading standards is particularly important for antitrust claims, because "'proceeding to antitrust discovery can be expensive.' Thus, a court should 'insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.'" *Suture Express, Inc. v. Cardinal Health 200, LLC*, No. 12-cv-2760-RDR, 2013 WL 3991798, at *3 (quoting *Twombly*, 550 U.S. at 558; internal quotations in *Twombly* omitted).

## III. PLAINTIFFS' ANTITRUST CLAIMS FAIL.

### A. The Colorado ASCs Do Not Allege A Plausible Antitrust Conspiracy.

When relying on allegations of a conspiracy to support an antitrust claim, as the Colorado ASCs do here, the alleged conspirators' conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. Thus, when an alleged antitrust conspiracy can be explained by a defendant's "natural unilateral reaction" to developments in the market, "there is no reason to infer that the [defendant]

companies had agreed among themselves to do what was only natural anyway." *Id*. at 566 (dismissing Sherman Act § 1 claim); *see also Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (plaintiff must "exclude the possibility that the [defendants] were acting independently"); *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1361 (10th Cir. 1989) ("[T]he conspiracy allegation will fail if there is an independent business justification which explains the alleged conspirators' conduct.").

Here, the face of the Complaint makes it clear that any actions Cigna undertook can be explained by an independent business justification rather than a conspiratorial agreement. The ASCs claim that Cigna furthered the alleged antitrust conspiracy by "terminat[ing] participating physicians and/or . . . threaten[ing] to terminate physicians who referred patients to the [Colorado ASCs]' facilities and to require participating physicians to refer patients to ambulatory facilities owned in whole or in part by the co-conspirator hospital systems." (Compl. ¶ 98.) But Cigna clearly had an independent business justification for taking these steps, given that the ASCs readily admit in their Complaint that they were engaged in fee-forgiving (*e.g.*, *id.* ¶ 6), which is prohibited under Colorado law. *See* Colo. Rev. Stat. § 18-13-119(1)-(3). Court after court has also recognized that deterring fee-forgiving is in the interests of plans as a way to protect the integrity of provider networks. *See Biomed*, 2013 WL 2991293, at *1; *Kennedy*, 924 F.2d at 698; *Smilecare,* 88 F.3d at 786; *Davidowitz*, 946 F.2d at 1479; *N. Cypress*, Civ. No. 09-2556, slip op. at 13; *Wellness Aerobic*, 1999 WL 118013, at *2 n.2; *see also New Mexico v. Equitable Life Assurance Soc'y of the U.S.*, 447 F.2d 620, 622-23 (10th

Cir. 1991) ("The purpose of the policy is to protect the insured for hospital and medical care expenditures, not to provide a windfall for the insured or a third party."). Cigna cannot be liable for taking independent action to avoid falling prey to the Colorado ASCs' illegal conduct.

Just as important, the ASCs admit that their billing policies conflict with the terms of their patients' plans. These plans require the ASCs' patients to pay a specific portion of the costs for out-of-network services, but the Colorado ASCs concede that they tell patients to ignore these cost-sharing provisions. ERISA, however, mandates that Cigna administer plans according to their terms, including cost-sharing provisions. *See Wellness Aerobic*, 1999 WL 118013, at *2 n.2 (noting that the plan "requires participants to pay co-payments and deductibles which cannot be waived"); *see also Booten v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997) ("a health plan administrator may–indeed must–deny benefits that are not covered by the plan . . . ."). Cigna's decision to terminate providers who supported billing practices inconsistent with plan terms is therefore entirely justifiable in its own right.

Finally, the ASCs admit that Cigna "pays ***far less***" reimbursing in-network claims than out-of-network claims. (Compl. ¶ 34 (emphasis added).) Indeed, the Colorado ASCs attribute the entire conspiracy to this allegation, contending that Cigna's motivation for "steer[ing] patients to facilities owned in whole or in part by the co-conspirator hospital systems" because these hospitals "are paid [at] ***much lower*** in-network rates." (*Id*. ¶ 17 (emphasis added); *see id*. ¶ 99 (same).) The law is clear that Cigna had no duty to do business with the Colorado ASCs, *see Four Corners*, 582 F.3d

at 1223-25, and it was perfectly natural and economically rational for Cigna to steer plan participants away from more expensive, out-of-network facilities like the ASCs toward less expensive, network facilities to reduce costs. *See Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1263 (10th Cir. 2006) (recognizing that "negotiat[ing] lower reimbursement rates" to medical providers is a "procompetitive justification"). Accordingly, the Colorado ASCs' antitrust claims against Cigna must be dismissed because they are simply implausible.

In contrast to the compelling unilateral reasons behind Cigna's conduct, the theory behind the alleged conspiratorial agreement is irrational, as its premise is that Cigna would work with the two dominant hospital systems to increase their market share, allowing them to raise their rates on Cigna in the long term. (Compl. ¶¶ 97-98.) The economic implausibility of this antitrust theory is fatal to the Colorado ASCs' claim. *See TVCN*, 964 F.2d at 1026-27; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (if defendants "had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy."); *Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 563 (E.D. Pa. 2002).

### B. Plaintiffs' Barebones Allegations Are Inadequate To Show That Cigna Entered Into Any Conspiratorial Agreement.

The Colorado ASCs fill their Complaint with unsupported conclusory statements that Cigna was "a member of the conspiracy" or acted "in furtherance of [it]," but the Court must disregard these "bare assertions." *See Twombly*, 550 U.S. at 556; *Khalid v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (noting that courts "will disregard

conclusory statements and look only to whether the remaining factual allegations plausibly suggest the plaintiff is liable"). In fact, of the Complaint's 166 paragraphs, the ASCs devote only a handful to Cigna's alleged interactions with purported co-conspirators. These paragraphs fall under two categories, neither of which satisfies the Colorado ASCs' pleading burden.

First, the Colorado ASCs assert that Cigna "met and communicated with its co-conspirators throughout the end of 2011 and 2012." (Compl. ¶ 104; *see also id.* ¶ 16.) Absent from this allegation, however, is any factual assertion as to who acted on behalf of Cigna and whether and what Cigna agreed to do in concert with other managed care companies or hospitals. The mere fact that Cigna employees may have had discussions with third parties over the course of a year is not an antitrust violation. *See Twombly*, 550 U.S. at 565 n.10 (dismissal proper where complaint "furnishes no clue as to [who] supposedly agreed, or when and where the illicit agreement took place").

Second, the Colorado ASCs allege that Cigna attended a trade association meeting in August 2012 where "it was agreed that CIGNA and the other health insurers would join in a concerted boycott of the Plaintiffs." (Compl. ¶ 105.) But the Colorado ASCs do not actually allege that Cigna agreed to anything, only that unidentified parties agreed what action Cigna and others should take. That Cigna attended a trade association meeting, then "continue[d]" doing what it allegedly had been doing since 2011 (*id*. ¶ 106), is not enough to show an agreement even if "those meetings [were] where key facets of the conspiracy were allegedly adopted or advanced." *See In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 714 (E.D. Pa. 2011).

In fact, the only specific action that Cigna allegedly undertook after this meeting—the termination of several network provider contracts—occurred more than ***14 months*** later, and a year after the Colorado ASCs filed antitrust claims against Cigna's alleged conspirators. (Compl. ¶¶ 107-18.) The Colorado ASCs offer no plausible explanation why Cigna would agree to undertake "concerted" action in August 2012 and then wait more than a year to act, or why it would go forward with the alleged antitrust conspiracy in 2013 long after the ASCs had filed antitrust claims. Given the Colorado ASCs' admissions of illegal fee-forgiving, Cigna's decision to end its relationship with network providers who helped the Colorado ASCs violate Colorado law and Cigna's plan terms is neither surprising nor unlawful. *See Four Corners*, 582 F.3d at 1221 (quoting *Pac. Bell. Tel. Co. v. Linkline Commc'ns, Inc.*, 129 S.Ct. 1109 (2009) ("As a general rule businesses are free to choose the parties with whom they deal, as well as the prices, terms, and conditions of that dealing.")); *Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1194 (10th Cir. 2009) ("The Supreme Court has recognized the economic value of allowing businesses to decide with whom they will deal."); *see also Matsushita*, 475 U.S. at 588 ("conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy").

**C. Plaintiffs Do Not Allege An Antitrust Violation Under Either The Per Se Rule Or Rule Of Reason.**

"Critical to a Section 1 analysis is the determination of whether the challenged conduct 'constitutes a *per se* violation of the statute' or whether the conduct should be analyzed to see if it 'create[s] an unreasonable restraint of trade'—the so-called 'rule of

reason.'" *Total Renal Care, Inc. v. W. Nephrology & Metabolic Bone Disease, P.C.* ("*TRC*"), No. 08-cv-00513-CMA-KMT, 2009 WL 2596493, at *4 (D. Colo. Aug. 21, 2009) (quoting *TVCN*, 964 F.2d at 1027). Because the Colorado ASCs have failed to state a violation under either rule, their antitrust claims should be dismissed.

***No Per Se Violation*.** "The *per se* rule is cautiously applied, as it deems conduct illegal without requiring a detailed market or economic analysis." *TRC*, 2009 WL 2596493, at *4 (citing *Nw. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.*, 472 U.S. 284, 289 (1985)). To invoke *per se* treatment for a group boycott, as the Colorado ASCs attempt to do here, the Complaint must allege a horizontal agreement, one that is "between conspirators who compete at the same market level." *TVCN*, 964 F.2d at 1027. The Colorado ASCs, however, provide no factual allegations that Cigna agreed to a group boycott with competing insurers, instead passively alleging that Cigna attended one meeting where "it was agreed that CIGNA and the other health insurers would join in a concerted boycott." (Compl. ¶ 106.) This vague allegation gives no information about which parties actually made the agreement, precluding the harsh application of the *per se* rule. *Compliance Marketing, Inc. v. Drugtest, Inc.*, No. 09-cv-01241-JLK, 2010 WL 1416823, at *12 (D. Colo. Apr. 7, 2010) (finding plaintiffs did not plead a group boycott warranting *per se* treatment where they "failed to specifically allege the existence of an agreement among" horizontal competitors).

The Complaint also makes no assertions about the alleged conspirators' market power, making *per se* treatment inappropriate. *See S.J. Glauser DCJB, LLC v. Porsche Cars N.A., Inc.*, No. 05-cv-01493, 2006 WL 1816458, at *11 (D. Colo. June 30, 2006)

("[T]he Amended Complaint does not even allege a relevant market or market power in the hands of [defendant]. Absent such allegations, plaintiff has failed to allege a group boycott that constitutes a *per se* violation of Section 1."); *see also FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986) ("[T]he *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor."); *Med. Supply Chain, Inc. v. Gen. Elec. Co.*, 144 F. App'x 708, 714-15 (10th Cir. 2005) (dismissing Section 1 claim and finding *per se* application inappropriate where business seeking a loan failed to plead defendant lender had market power in financial market).

Finally, *per se* treatment of group boycotts is inappropriate because Cigna has "plausible arguments concerning procompetitive effects [of its conduct]." *See Diaz v. Farley*, 215 F.3d 1175, 1183-84 (10th Cir. 2000) (citing *Nw. Wholesale*, 472 U.S. at 294). As noted in Section II.A above, these justifications include ensuring compliance with state law and ERISA plan terms, protecting its provider network against fee forgiving, and lowering costs to its plans. *See Compliance Marketing*, 2010 WL 1416823, at *13 (finding "that the procompetitive effects of [alleged horizontal] agreements outweighs any potential repugnance.").

***No Rule of Reason Violation***. Under the rule of reason, "[t]he plaintiffs bears the initial burden of showing that an agreement had a substantially adverse effect on competition." *Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1205 (10th Cir. 2006) (quoting *Law v. NCAA*, 134 F.3d 1010, 1019 (10th Cir. 1998)). This requires the Court to ask, among other things, "whether the offending competitor . . . possesses

market power in the relevant market where the alleged anticompetitive activity occurs." *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 965 (10th Cir. 1994). The Colorado ASCs' failure to allege any facts about market power therefore warrants dismissal of their antitrust claims. *See TVCN*, 964 F.2d at 1027-28.

Indeed, the Colorado ASCs do not even plead a relevant market. *See TRC*, 2009 WL 2596493, at *7 ("[F]ailure to allege a legally sufficient market is cause for dismissal.") (internal quotations omitted). To meet this requirement, the Colorado ASCs must define both the relevant geographic market and product market. *Id.*; *see also SCFC*, 36 F.3d at 966. They do neither. Instead, the Colorado ASCs note that the relevant parties are located in Denver and Colorado Springs and that they all provide healthcare services at medical facilities. (Compl. ¶ 97.) Such broad brushstrokes are nowhere near enough. *See TRC*, 2009 WL 2596493, at *7 (dismissing Section 1 claim because plaintiff's allegation that the "Denver metropolitan area is the relevant geographic market, and '[t]he provision of dialysis services and the operation of kidney dialysis clinics' is the relevant product" was insufficient to state a relevant market).

**CONCLUSION**

For the foregoing reasons, Counts VI and VII of the Complaint should be dismissed.

DATED this 10th day of February, 2014.

Respectfully submitted,

By: */s/ Edwin P. Aro*_________________
Edwin P. Aro
ARNOLD & PORTER LLC
370 Seventeenth Street, Suite 4400
Denver, CO 80202
Telephone: 303.863.1000
ed.aro@aporter.com

Joshua B. Simon
Warren Haskel
Ryan D. McEnroe
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10016
Telephone: 212.446.4800
Facsimile: 212.446.4900
joshua.simon@kirkland.com
warren.haskel@kirkland.com
ryan.mcenroe@kirkland.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of February, 2014, I filed and served the foregoing **MOTION TO DISMISS** via CM-ECF which will send notification of such filing to all counsel of record.

/s/ Linda J. Teater