**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 13-cv-03422

ARAPAHOE SURGERY CENTER, LLC, CHERRY CREEK SURGERY CENTER, LLC, HAMPDEN SURGERY CENTER, LLC, KISSING CAMELS SURGERY CENTER, LLC, SURGCENTER OF BEL AIR, LLC, and WESTMINSTER SURGERY CENTER, LLC,

Plaintiffs,

v.

CIGNA HEALTHCARE, INC., CONNECTICUT GENERAL LIFE INSURANCE COMPANY, CIGNA HEALTHCARE - MID-ATLANTIC, INC., and CIGNA HEALTHCARE OF COLORADO, INC.,

Defendants.

# CIGNA'S MOTION TO DISMISS COUNTS VI AND VII OF PLAINTIFFS' FIRST AMENDED COMPLAINT

Defendants Cigna Healthcare, Inc., Cigna Healthcare of Colorado, Inc., and Connecticut General Life Insurance, Co. (collectively, "Cigna") hereby bring this Motion to Dismiss Counts VI and VII of the First Amended Complaint (D.E. 35) ("Complaint") filed by Arapahoe Surgery Center, LLC, Cherry Creek Surgery Center, LLC, Hampden Surgery Center, LLC, Kissing Camels Surgery Center, LLC, SurgCenter of Bel Air, LLC, and Westminster Surgery Center, LLC (collectively, the "ASCs"), pursuant to Fed. R. Civ. P. 12(b)(6).

Pursuant to D.C.COLO.L.CivR 7 and WJM Revised Practice Standard III.D, counsel for Cigna discussed the substance of this motion with counsel for the ASCs.

The ASCs oppose the relief that Cigna requests. Based upon the nature of the Complaint's defects and the ASCs' opposition, the undersigned do not believe that the deficiencies in the allegations can be corrected by further amendment.

## PRELIMINARY STATEMENT

This Court recently dismissed nearly identical antitrust claims brought by the same ASCs against other managed care companies. *See Kissing Camels Surgery Ctr., LLC v. Centura Health Corp.* 12-cv-3012-WJM, 2014 WL 560462 (D. Colo. Feb. 13, 2014) ("*Kissing Camels*"). In an effort to escape the same result here, the ASCs amended their Complaint, but the ASCs' amendments do not cure the defects that led this Court to dismiss their antitrust claims in *Kissing Camels*, nor do they address the additional, independent reasons raised in Cigna's previous motion to dismiss showing why the ASCs' antitrust claims fail.

As background, the ASCs' Complaint admits that they are engaged in an illegal practice known as "fee forgiving." Specifically, the ASCs admit that they lure potential patients to their out-of-network facilities by waiving the patients' required out-of-network co-insurance and deductible payments, instead charging patients amounts similar to what they would have paid if they visited facilities within Cigna's provider network, while at the same time billing Cigna out-of-network rates that are many times higher than the rates charged by in-network facilities. By waiving patients' co-insurance and deductible requirements in this manner, the ASCs have unlawfully collected millions of dollars in benefits that should never have been paid pursuant to the terms of Cigna's ERISA-

governed health plans. The ASCs have also violated Colorado law, which expressly forbids their billing practices.

The ASCs now contend that the actions Cigna took to protect itself from this illegal fee-forgiving scheme somehow violated antitrust laws. But as in *Kissing Camels*, the ASCs have not adequately pled the most basic element of such a claim, that Cigna reached an agreement with its alleged co-conspirators. Indeed, despite amending their Complaint, the ASCs still fail to provide any factual allegations as to the nature of the alleged agreement. And for good reason, given that according to the ASCs' own allegations, Cigna's actions in furtherance of the purported conspiracy began in December 2011, long before any meeting or alleged agreement ever took place.

Unable to allege an actual agreement, the ASCs can argue only that their allegations of parallel conduct between Cigna and other managed care companies to terminate contracts of network physicians who referred patients to the ASCs are sufficient to reasonably suggest an agreement. This Court has already rejected this conspiracy theory too, finding in *Kissing Camels* that the ASCs' allegations that managed care companies like Cigna acted to shield themselves from the ASCs' unlawful business practices reasonably suggested the managed care companies acted based on their independent self-interest, not an actual agreement. Further adding to this pleading defect, the ASCs fail to allege anything about the market power of the alleged conspirators or the relevant market that the alleged conspiracy affected. Accordingly, the ASCs' antitrust claims should be dismissed.

## I. BACKGROUND

To help manage health care costs, Cigna-administered health plans incentivize members to use Cigna's network of healthcare providers, who have agreed to accept discounted rates for their services in exchange for receiving access to Cigna's customers. (Compl. ¶¶ 32-34.) Accordingly, Cigna-administered plans generally provide that members will be responsible for lower co-insurance and deductible payments if they see network providers rather than out-of-network providers. The higher cost-sharing payments required for out-of-network services encourage the use of less costly network providers, and also serve as a check on the ability of out-of-network providers to charge astronomical rates for their services because when patients are required to pay a percentage of their out-of-network providers' charges as co-insurance, they generally avoid seeking treatment at out-of-network providers with inflated rates.

The ASCs are out-of-network facilities that tried to skirt these fundamental cost controls by charging two different prices for their services: one to their patients and another to their patients' health insurance plans. The ASCs lure patients by waiving the patients' required out-of-network cost-sharing responsibilities, instead charging them "co-pays, deductibles, and co-insurance amounts [at] in-network levels." (Compl. ¶ 6.) At the same time, the ASCs bill Cigna at their unreduced out-of-network rates, which are much higher than the in-network rates on which they based the patient's responsibility. (*Id*. ¶ 17 (admitting that in-network hospitals "are paid ***much lower*** in-network rates" than the ASCs) (emphasis added); *id*. ¶ 34 (acknowledging that Cigna "pays ***far less***" reimbursing in-network claims than out-of-network claims) (emphasis

added).) This practice—in which a provider submits charges to a member's plan but waives collection of the members' required cost-sharing responsibility—is called "cost share waiver" or "fee-forgiving."

The ASCs' fee-forgiving business model undermines the cost-control measures set forth in Cigna-administered plans. By waiving a patient's higher out-of-network costs while still charging Cigna undiscounted, out-of-network rates, the ASCs take away any incentive that their patients have to see network providers, and remove a critical check on the ASCs' ability to charge astronomical rates for their services.

Not surprisingly, court after court has recognized the legitimate interests in preventing fee-forgiving schemes.[1] For example, in *Kennedy v. Connecticut General Life Insurance Co.*, 924 F.2d 698 (7th Cir. 1991), the Seventh Circuit affirmed Cigna's right to deny payment to a provider who waived the member's co-insurance payment but billed Cigna for his full charges. As the court explained, the "[patient]'s plan and CIGNA's policy require co-payments in order to maintain incentives that hold down the

---

[1] *See Biomed Pharmaceuticals, Inc. v. Oxford Health Plans (N.Y.), Inc.*, 12-cv-3023, 2013 WL 2991293, at *1 (2d Cir. 2013) (where provider "routinely" waived patients' "deductible and coinsurance obligations," "it was reasonable for [insurer] to pay a reduced amount"); *Smilecare Dental Grp. v. Delta Dental Plan of Calif.,* 88 F.3d 780, 786 (9th Cir. 1996) (affirming dismissal of Sherman Act claim contesting plan's refusal to accept payments from supplemental insurers in lieu of co-payments from patients because "[plan]'s policy is supported as a matter of law by a legitimate business justification–its interest in protecting the disciplinary effect of its co-payment plan"); *Davidowitz v. Delta Dental Plan of Calif., Inc.*, 946 F.2d 1476, 1479 (9th Cir. 1991) (cost-sharing "waivers annul the benefits of the co-payment system"); *N. Cypress Med. Ctr. Operating Co. v. CIGNA Healthcare*, 09-cv-2556, slip op. at 13 (S.D. Tex. Aug. 10, 2012) (interpreting Cigna's plans to bar ERISA benefits claims where provider forgave member's cost-sharing responsibility, noting that "any alternative reading would result in significant and unanticipated costs to the ERISA plans").

cost of medical care," and "its terms will be enforced." *Id*. at 702. As opinions like *Kennedy* make clear, such practices have a perverse effect on healthcare insurance, ultimately making coverage more expensive for everyone by increasing the amounts plans pay to providers, and in turn increasing premiums. Indeed, Colorado law prohibits the fee-forgiving practices in which the ASCs admit they engage. Colo. Rev. Stat. § 18-13-119 (2012) (prohibiting billing practices that "have the effect of eliminating the need for actual payment by the recipient of health care of required copayments and deductibles in health benefit plans").

## II. LEGAL STANDARD.

To state a claim under Section 1 of the Sherman Act (Count VI) or the Colorado Antitrust Act (Count VII), the Colorado ASCs must plead facts that show Cigna entered into "'[(1)] a contract, combination in the form of trust or otherwise, or conspiracy, [(2)] in restraint of trade or commerce [(3)] among the several States, or with foreign nations.'" *Kissing Camels*, 2014 WL 560462, at *4 (quoting 15 U.S.C. § 1).

Dismissal is appropriate where the complaint fails to offer factual allegations as to each of these three elements sufficient to make the ASCs' claims plausible on their face. *See Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In particular, in the antitrust context a court should "insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Suture Express, Inc. v. Cardinal Health 200, LLC*, 963 F. Supp. 2d 1212, 1218 (D. Kan. 2013) (citing *Twombly*, 550 U.S. at 558).

## III. PLAINTIFFS' ANTITRUST CLAIMS FAIL.

### A. Plaintiffs' Allegations Do Not Show That Cigna Entered Into Any Conspiratorial Agreement.

This Court recently held that nearly identical allegations by the same ASCs against other managed care companies were insufficient to survive a motion to dismiss, as the ASCs failed to adequately allege an agreement to restrain trade. *See Kissing Camels*, 2014 WL 560462, at *6-9. As the Court explained, while "Plaintiffs' allegations of the specific actions each Insurer Defendant took against physicians and health care providers using Plaintiffs' facilities are numerous and detailed," their antitrust claims were insufficient because "Plaintiffs' allegations only indirectly support an inference of such an agreement [with each other and with Centura and HCA]." *Id.* at *8.

In an attempt to avoid the result in *Kissing Camels*, the ASCs tried to address their failure by amending their Complaint from vaguely alleging that "it was agreed" in one instance that Cigna and others would join a boycott (D.E. 1 ¶ 105) to vaguely alleging that "CIGNA agreed" twice, first at an August 2012 meeting to "join a concerted boycott of the Colorado Plaintiffs," and second, at an unidentified later date, "to take action against its contracted physicians who referred patients to the Colorado Plaintiffs' facilities." (Compl. ¶¶ 106, 108.) But the ASCs cannot meet their pleading burden merely by invoking the word "agreed"—as this Court already found, they must offer "facts ***directly evidencing*** the Insurers' agreement with Centura and HCA." *Kissing Camels*, 2014 WL 560462, at *8 (emphasis added); *see also Drake v. Cox Commc'ns, Inc.,* 10-cv-2672, 2011 WL 2680688, at *3 (D. Kan. July 8, 2011) (dismissing conspiracy claim that "merely alleges at the most general level that 'Defendants do have an actual

and/or de facto agreement to exclude competition,'" explaining that "this generality is repeated throughout Drake's lengthy complaint, but repetition is no substitute for the specificity required by *Twombly*." (internal citations omitted)).

Those types of direct factual allegations are still missing from the ASCs' Complaint, leaving the Court with no explanation for the ASCs' change from "it was agreed" to "CIGNA agreed" following this Court's dismissal opinion in *Kissing Camels*. Absent such allegations, the ASCs' conclusory allegations that "CIGNA agreed" are nothing more than "buzz words" that the Tenth Circuit and District of Colorado have repeatedly held are insufficient to state an antitrust claim. For instance, in *TV Communications Network, Inc. v. Turner Network Television, Inc.* ("*TVCN*"), 964 F.2d 1022, 1027 (10th Cir. 1992), the plaintiff alleged, among other things, that the TNT channel entered into "agreements with cable operators to exclude [plaintiff] from receiving the TNT channel" and "conspired to boycott [plaintiff]." *Id*. at 1026. But the Tenth Circuit found that where a plaintiff "fails to elaborate on these allegations," such "bare bones" allegations are insufficient. *Id*. ("The use of antitrust 'buzz words' does not supply the factual circumstances necessary to support [plaintiff's] conclusory allegations."); *see also Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006); *Sweeney v. Marvin Windows, Inc.*, 10-cv-457, 2010 WL 4256195 (D. Colo. Oct. 20, 2010).

Moreover, the timeline the ASCs allege shows the implausibility of the ASCs' bald assertion of an agreement. The ASCs concede that Cigna began taking these actions by December 21, 2011—more than ***nine months before*** the alleged agreement. (*Id*. ¶¶ 101-02.) That Cigna attended a trade association meeting, then

"continue[d]" (*id.* ¶ 109) doing what it had already been doing unilaterally since 2011 cannot support a plausible inference of conspiracy. *See Twombly*, 550 U.S. at 566 ("there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway"); *Compliance Mktg., Inc. v. Drugtest, Inc.*, 09-cv-012421, 2010 WL 1416823, at *4 (D. Colo. Apr. 7, 2010) (Section 1 "does not . . . apply to unilateral conduct, regardless of its impact on trade or commerce.).

The only action that Cigna allegedly took in furtherance of the conspiracy ***after*** joining it—the termination of several network provider contracts—occurred ***14 months*** later. (Compl. ¶¶ 110-21.) The ASCs offer no plausible explanation why Cigna would agree to undertake "concerted" action in August 2012 and then wait more than a year to act. Given the ASCs' admissions of illegal fee-forgiving, Cigna's decision to end its relationship with network providers who helped the ASCs violate Colorado law and Cigna's plan terms is neither surprising nor unlawful. *Four Corners Nephrology Assocs. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1221 (10th Cir. 2009) (quoting *Pac. Bell. Tel. Co. v. Linkline Commc'ns, Inc.*, 129 S.Ct. 1109 (2009) ("As a general rule businesses are free to choose the parties with whom they deal.")); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) ("conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy").

Finally, the ASCs' allegation that Cigna "kept HealthOne apprised of its efforts" (Compl. ¶ 108) does not fill this gap. Merely alleging that Cigna communicated to HealthOne about its interactions with referring physicians does not show that Cigna

consciously joined a conspiracy involving not just of HealthOne, but also another hospital system, other managed care companies, and a trade association. *See In re TFT-LCD Antitrust Litig.,* 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) ("[T]he complaint must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." (citations and internal quotations omitted)). Moreover, U.S. Supreme Court and Tenth Circuit case law makes clear that merely alleging that Cigna responded to the "pressuring" (Compl. ¶ 108) of an in-network provider is not enough to show that Cigna agreed to take concerted action in violation of Section 1. *See Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984) (Court would not "permit the inference of concerted action on the basis of receiving complaints alone"); *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1263 (10th Cir. 2006) ("But simply because IHC acted in response to ophthalmologists' complaints is not enough to establish the concerted action requirement.").

**B. The Colorado ASCs' Allegations Of Parallel Conduct Do Not Suggest A Plausible Antitrust Conspiracy.**

Unable to allege an actual agreement, the ASCs are left with only the argument that Cigna and other managed care companies engaged in parallel conduct that show an agreement existed. As the Court already found in *Kissing Camels*, this argument fails because the ASCs' allegations "of the Insurers' parallel conduct . . . are insufficient to reasonably suggest that the parallel conduct was the result of an agreement and not the result of independent factors." *Kissing Camels,* 2014 WL 560462, at *9.

Specifically, in *Kissing Camels*, the ASCs' alleged that Cigna and other managed care companies threatened to or did terminate the contracts of physicians who "were in breach of their network contracts because the[se physicians] were referring patients to out-of-network facilities." *Id*. This Court also noted that the managed care companies who were allegedly "influenced because of the market power Centura and HCA possess" had "further independent, non-conspiratorial reasons to take these actions." *Id*. The ASCs' same allegations against Cigna fare no better here. (Compl. ¶¶ 98-121.)

In other words, the Court should not infer that Cigna entered into an illicit antitrust conspiracy based on "merely parallel conduct that could just as well be independent action." *See Twombly*, 550 U.S. at 556-57 (finding that when an alleged antitrust conspiracy can be explained by a defendant's "natural unilateral reaction" to developments in the market, "there is no reason to infer that the [defendants] had agreed among themselves to do what was only natural anyway"); *Monsanto*, 465 U.S. at 764 (plaintiff must "exclude the possibility that the [defendants] were acting independently"); *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1361 (10th Cir. 1989) ("[T]he conspiracy allegation will fail if there is an independent business justification which explains the alleged conspirators' conduct.").

Nor is it just this Court that has recognized a managed care company faced with fee-forgiving—a practice in which the ASCs admittedly engage (*e.g.*, Compl. ¶ 6)—has independent reasons to act as Cigna did. For one thing, Cigna had an incentive to deter referrals to fee-forgiving providers by enforcing the provisions of its network contracts prohibiting referrals to out-of-network providers because fee forgiving is prohibited

under Colorado law. *See* Colo. Rev. Stat. § 18-13-119(1)-(3). Moreover, court after court has recognized that deterring fee forgiving is in the plans' interests as a way to protect the integrity of provider networks and control healthcare costs. (*See supra* § I.)

In concert with this case law, the ASCs' billing policies conflict with the terms of their patients' plans. These plans require the ASCs' patients to pay a specific portion of the costs for out-of-network services, but the ASCs concede that they tell patients to ignore these cost-sharing provisions. (Compl. ¶ 6.) ERISA, however, mandates that Cigna administer plans according to their terms, including cost-sharing provisions. *See Wellness Aerobic & Sports Med. Clinic, Inc. v. Metra Health*, 98-cv-2454, 1999 WL 118013, at *2 n.2 (E.D. La. Mar. 3, 1999) (noting that plan "requires participants to pay co-payments and deductibles which cannot be waived," and "any other interpretation of the plan would result in unanticipated costs to the plan"); *see also Booten v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997) ("a health plan administrator may–indeed must–deny benefits that are not covered by the plan . . . ."). Cigna's decision to terminate providers who supported billing practices inconsistent with plan terms is therefore entirely justifiable in its own right.

Finally, the ASCs admit that Cigna "pays ***far less***" reimbursing in-network claims than out-of-network claims. (Compl. ¶ 34 (emphasis added).) Indeed, the Colorado ASCs attribute the entire conspiracy to this allegation, contending that Cigna's motivation for "steer[ing] patients to facilities owned in whole or in part by the co-conspirator hospital systems" because these hospitals "are paid [at] ***much lower*** in-network rates." (*Id*. ¶ 17 (emphasis added); *see id*. ¶ 99 (same).) The law is clear that

Cigna had no duty to do business with the Colorado ASCs, *see Four Corners*, 582 F.3d at 1223-25, and it was perfectly natural and economically rational for Cigna to steer plan participants away from more expensive, out-of-network facilities like the ASCs toward less expensive, network facilities to reduce costs. *See Abraham*, 461 F.3d at 1263 (recognizing that "negotiat[ing] lower reimbursement rates" to medical providers is a "procompetitive justification"). The Colorado ASCs' antitrust claims against Cigna must be dismissed because they are simply implausible.

### C. Plaintiffs Do Not Allege An Antitrust Violation Under Either The Per Se Rule Or Rule Of Reason.

"Critical to a Section 1 analysis is the determination of whether the challenged conduct 'constitutes a *per se* violation of the statute' or whether the conduct should be analyzed to see if it 'create[s] an unreasonable restraint of trade'—the so-called 'rule of reason.'" *Total Renal Care, Inc. v. W. Nephrology & Metabolic Bone Disease, P.C.* ("*TRC*"), 08-cv-00513, 2009 WL 2596493, at *4 (D. Colo. Aug. 21, 2009) (quoting *TVCN*, 964 F.2d at 1027). Because the Colorado ASCs have failed to state a violation under either rule, their antitrust claims should be dismissed.

***No Per Se Violation*.** "The *per se* rule is cautiously applied, as it deems conduct illegal without requiring a detailed market or economic analysis." *TRC*, 2009 WL 2596493, at *4. To invoke *per se* treatment for a group boycott, as the Colorado ASCs attempt here, the Complaint must adequately allege a horizontal agreement "between conspirators who compete at the same market level." *TVCN*, 964 F.2d at 1027. The Colorado ASCs, however, provide no specific factual allegations that Cigna agreed to a group boycott with its competitors, alleging only that it "agreed with the other

participants that it would join in a concerted boycott." (Compl. ¶ 106.) This vague allegation gives no information about which parties actually agreed to act, precluding the harsh application of the *per se* rule. *Compliance Marketing*, 2010 WL 1416823, at *12 (finding alleged boycott did not warrant *per se* treatment where plaintiffs "failed to specifically allege the existence of an agreement among" horizontal competitors).

The Complaint also makes no assertions about the alleged conspirators' market power, making *per se* treatment inappropriate. *See S.J. Glauser DCJB, LLC v. Porsche Cars N.A., Inc.*, 05-cv-01493, 2006 WL 1816458, at *11 (D. Colo. June 30, 2006) (where complaint "does not even allege a relevant market or market power in the hands of [defendant] . . . plaintiff has failed to allege a group boycott that constitutes a *per se* violation of Section 1"); *see also Med. Supply Chain, Inc. v. Gen. Elec. Co.*, 144 F. App'x 708, 714-15 (10th Cir. 2005) (*per se* application was inappropriate where business seeking loan failed to plead lender had market power in financial market).

Finally, *per se* treatment of group boycotts is inappropriate because Cigna has "plausible arguments concerning procompetitive effects [of its conduct]." *See Diaz v. Farley*, 215 F.3d 1175, 1183-84 (10th Cir. 2000) (citing *Nw. Wholesale*, 472 U.S. at 294). As noted in Section III.B above, these justifications include ensuring compliance with state law and ERISA plan terms, protecting its provider network against fee forgiving, and lowering costs to its plans. *See Compliance Marketing*, 2010 WL 1416823, at *13 (finding "that the procompetitive effects of [alleged horizontal] agreements outweighs any potential repugnance").

***No Rule of Reason Violation***. Under the rule of reason, "[t]he plaintiffs bears the initial burden of showing that an agreement had a substantially adverse effect on competition." *Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1205 (10th Cir. 2006). This requires the Court to ask, among other things, "whether the offending competitor . . . possesses market power in the relevant market where the alleged anticompetitive activity occurs." *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 965 (10th Cir. 1994). The Colorado ASCs' failure to allege any facts about market power therefore warrants dismissal of their antitrust claims. *See TVCN*, 964 F.2d at 1027-28.

Indeed, the Colorado ASCs do not even plead a relevant market. *See TRC*, 2009 WL 2596493, at *7 ("[F]ailure to allege a legally sufficient market is cause for dismissal.") (internal quotations omitted). To meet this requirement, they must define both the relevant geographic market and product market. *Id.*; *see also SCFC*, 36 F.3d at 966. They do neither. Instead, the Colorado ASCs note that the relevant parties are located in Denver and Colorado Springs and that they all provide healthcare services at medical facilities. (Compl. ¶ 97.) Such broad brushstrokes are nowhere near enough. *See TRC*, 2009 WL 2596493, at *7 (dismissing Section 1 claim because plaintiff's allegation that the "Denver metropolitan area is the relevant geographic market, and '[t]he provision of dialysis services and the operation of kidney dialysis clinics' is the relevant product" was insufficient to state a relevant market).

## CONCLUSION

For the foregoing reasons, Counts VI and VII of the Complaint should be dismissed.

DATED this 11th day of April, 2014.

Respectfully submitted,

By: */s/ Edwin P. Aro* ________________
Edwin P. Aro
ARNOLD & PORTER LLC
370 Seventeenth Street, Suite 4400
Denver, CO 80202
Telephone: 303.863.1000
ed.aro@aporter.com

Joshua B. Simon
Warren Haskel
Ryan D. McEnroe
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10016
Telephone: 212.446.4800
Facsimile: 212.446.4900
joshua.simon@kirkland.com
warren.haskel@kirkland.com
ryan.mcenroe@kirkland.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of April, 2014, I filed and served the foregoing **MOTION TO DISMISS** via CM-ECF which will send notification of such filing to all counsel of record.

*/s/ Linda J. Teater*