**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 13-cv-3422-WJM-CBS

ARAPAHOE SURGERY CENTER, LLC,
CHERRY CREEK SURGERY CENTER, LLC,
HAMPDEN SURGERY CENTER, LLC,
KISSING CAMELS SURGERY CENTER,
SURGCENTER OF BEL AIR, LLC, and
WESTMINSTER SURGERY CENTER, LLC,

      Plaintiffs,

v.

CIGNA HEALTHCARE, INC.,
CONNECTICUT GENERAL LIFE INSURANCE COMPANY,
CIGNA HEALTHCARE - MID-ATLANTIC, INC., and
CIGNA HEALTHCARE OF COLORADO, INC.,

      Defendants.

---

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS

---

Plaintiffs Arapahoe Surgery Center, LLC, Cherry Creek Surgery Center, LLC,

Hampden Surgery Center, LLC, Kissing Camels Surgery Center, LLC, SurgCenter of

Bel Air, LLC, and Westminster Surgery Center, LLC (collectively "Plaintiffs") bring this

action alleging claims under the Sherman Act, 15 U.S.C. §§ 1 *et seq.*, and the Colorado

Antitrust Act, Colo. Rev. Stat. §§ 6-4-101 *et seq.*, against Defendants Cigna Healthcare,

Inc., Connecticut General Life Insurance Co., Cigna Healthcare–Mid-Atlantic, Inc., and

Cigna Healthcare of Colorado, Inc. (collectively "Defendants" or "Cigna").[1]  (Second Am.

---

[1] The instant Motion seeks dismissal of the antitrust claims in the Second Amended
Complaint brought by only four of the six Plaintiffs (Arapahoe Surgery Center, Cherry Creek
Surgery Center, Hampden Surgery Center, and Kissing Camels Surgery Center) against only
three of the four Defendants (Cigna Healthcare, Connecticut General Life Insurance Co., and
Cigna Healthcare of Colorado).  (SAC pp. 2, 62-63.)  However, the Motion is filed by all four

Compl. ("SAC") (ECF No. 60) at 62-64.) Before the Court is Cigna's Motion to Dismiss

Counts VI and VII of Plaintiffs' Second Amended Complaint ("Motion"). (ECF No. 61.)

For the reasons set forth below, the Motion is denied.

## I. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to

dismiss a claim in a complaint for "failure to state a claim upon which relief can be

granted." In evaluating such a motion, a court must "assume the truth of the plaintiff's

well-pleaded factual allegations and view them in the light most favorable to the

plaintiff." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

In ruling on such a motion, the dispositive inquiry is "whether the complaint contains

'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Granting a motion to dismiss "is a harsh

remedy which must be cautiously studied, not only to effectuate the spirit of the liberal

rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of*

*Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quotation marks omitted). "Thus, 'a

well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of

those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting

*Twombly*, 550 U.S. at 556).

## II. BACKGROUND

The relevant allegations, as pled in the SAC, are as follows.

---

Defendants, and all six Plaintiffs responded to it. (*See* ECF Nos. 61 & 63.) Therefore, for the purposes of this Order, the Court will use the terms "Plaintiffs" and "Defendants" when referring to the parties' positions on the Motion even where not all Plaintiffs or Defendants are implicated in the underlying claims.

Plaintiffs are ambulatory surgery centers performing surgical procedures and treatments in a non-hospital environment.  (SAC ¶ 1.)  Defendants are entities providing health insurance benefits under the trade name "Cigna".  (*Id.* pp. 1-2.)  Plaintiffs allege that Cigna violated the antitrust laws by conspiring with two hospital systems, HCA-HealthONE ("HCA"), and Centura Health Corporation ("Centura") (together "Hospitals"), as well as a trade association and the other dominant health insurers in the market, to damage Plaintiffs' businesses and drive them out of the market for surgical procedures not requiring hospitalization.  (*Id.* ¶ 16.)

Beginning in 2010, Centura and HCA conspired to reduce competition for ambulatory surgery services by using their market power to compel physicians and insurers not to do business with Plaintiffs, and to convince insurers to join the conspiracy and take similar actions against physicians referring patients to Plaintiffs.  (*Id.* ¶¶ 162-66.)  Cigna agreed to do so, and in December 2011, threatened its contracted physicians with termination of their relationships with Cigna due to their practice of referring patients to Plaintiffs.  (*Id.* ¶¶ 166-69.)

On May 18, 2012, Cigna representatives were present at a telephonic meeting of the co-conspirator trade association at which actions against Plaintiffs were discussed.  (*Id.* ¶ 173.)  In emails sent in July 2012, HCA executives discussed the actions to be taken against physicians referring patients to Plaintiffs in order to quell the competitive threat Plaintiffs posed, and reported that Cigna had agreed to participate in such actions and report back to HCA.  (*Id.* ¶¶ 174-75.)  On August 29, 2012, at a trade association meeting, representatives of both Hospitals, Cigna, and the other insurers

were present, and all expressed their mutual desire to stop the flow of dollars to Plaintiffs, creating a group boycott.  (*Id.* ¶ 176.)

In furtherance of the agreement, on January 16, 2013, Cigna sent two medical providers contract termination letters that falsely accused them of breaching their contracts with Cigna by referring patients to Plaintiffs.  (*Id.* ¶¶ 180-81.)  On November 8, 2013, Cigna sent contract termination letters with similar false accusations to twelve additional medical providers.  (*Id.* ¶¶ 182-93.)  Plaintiffs allege that these physicians' practices of referring patients to Plaintiffs was not a breach of their contracts with Cigna, and thus Cigna's alleged reasons for terminating its relationships with these medical providers were mere pretext for its conduct in furtherance of the conspiracy. (*Id.* ¶ 195.)

On December 18, 2013, Plaintiffs filed a Complaint against Defendants bringing antitrust and related claims.  (ECF No. 1.)  On February 10, 2014, Defendants filed Counterclaims against Plaintiffs.  (ECF No. 17.)  Plaintiffs filed a Motion to Dismiss the Counterclaims on April 11, 2014, which remains pending, and will be addressed in a separate order.  (ECF No. 43.)

Plaintiffs filed their SAC on July 9, 2013. (ECF No. 60.)  As pertinent to the instant Motion, the SAC alleges that Defendants conspired with the Hospitals, trade association, and other insurers to restrain trade in the Metro Denver South and Colorado Springs markets for ambulatory surgery services, in violation of both § 1 of the Sherman Act (Claim VI), and the parallel provision of the Colorado Antitrust Act (Claim VII).  (SAC ¶¶ 235-44.)  Plaintiffs' SAC also brings claims under the Employee Retirement Income Security Act ("ERISA") for failure to pay benefits, breach of fiduciary

duties, and failure to provide full and fair review, as well as state law claims for breach

of contract and the implied covenant of good faith and fair dealing.  (*Id.* ¶¶ 198-234.)

On July 23, 2014, Defendants filed the instant Motion.  (ECF No. 61.)  Plaintiffs

filed a Response (ECF No. 63), and Defendants filed a Reply (ECF No. 64).  The

Motion is ripe for disposition.

## III.  ANALYSIS

Defendants' Motion seeks dismissal of Plaintiffs' claim under § 1 of the Sherman

Act (Claim VI), and the analogous state claim pursuant to the Colorado Antitrust Act,

Colorado Revised Statute § 6-4-104 (Claim VII).  (ECF No. 61.)

The Sherman Act is a federal statute prohibiting monopolies and combinations in

restraint of trade.  The Colorado Antitrust Act is the state law analogue to the Sherman

Act.  *See* Colo. Rev. Stat. § 6-4-119 ("the courts shall use as a guide interpretations

given by the federal courts to comparable federal antitrust laws").  Because federal

antitrust law principles apply to both the federal and state antitrust claims, both claims

may be analyzed together.  *See Four Corners Nephrology Assocs., P.C. v. Mercy Med.*

*Ctr. of Durango*, 582 F.3d 1216, 1220 n.1 (10th Cir. 2009).

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form

of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several

States, or with foreign nations".  15 U.S.C. § 1; *see also* Colo. Rev. Stat. § 6-4-104

("Every contract, combination in the form of a trust or otherwise, or conspiracy in

restraint of trade or commerce is illegal.").  Defendants' Motion argues that Plaintiffs

have failed to plead both of the elements of a § 1 claim: (1) an agreement constituting a

contract, combination, or conspiracy, and (2) an unreasonable restraint of trade or

commerce.  (ECF No. 61.)  The Court will consider each element in turn.

A.      **Contract, Combination, or Conspiracy**

Section 1 prohibits only concerted, multilateral action.  *See Bell v. Fur Breeders*

*Agric. Coop.*, 348 F.3d 1224, 1232 (10th Cir. 2003).  "Because § 1 of the Sherman Act

does not prohibit all unreasonable restraints of trade but only restraints effected by a

contract, combination, or conspiracy, the crucial question is whether the challenged

anticompetitive conduct stems from independent decision or from an agreement, tacit

or express."  *Twombly*, 550 U.S. at 553 (internal citations and brackets omitted).

Accordingly, at the pleading stage, stating a § 1 claim "requires a complaint with

enough factual matter (taken as true) to suggest that an agreement was made. . . [and]

to raise a reasonable expectation that discovery will reveal evidence of illegal

agreement."  *Id.* at 556.  Such an agreement is established by evidence that the

conspiring parties "had a conscious commitment to a common scheme designed to

achieve an unlawful objective."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752,

764 (1984).

If the complaint does not directly allege an agreement but instead makes only

"allegations of parallel conduct . . . in order to make a § 1 claim, they must be placed in

a context that raises a suggestion of a preceding agreement, not merely parallel

conduct that could just as well be independent action."  *Twombly*, 550 U.S. at 557.

That is, the complaint must contain "allegations plausibly suggesting (not merely

consistent with) agreement".  *Id.*

In the Motion, Cigna argues that Plaintiffs have insufficiently alleged that it participated in a conspiracy. (ECF No. 61 at 6-13.) Cigna contends that Plaintiffs' direct allegations that Cigna agreed with the Hospitals to prevent physicians from referring patients to Plaintiffs facilities are conclusory, and that Plaintiffs allege only parallel conduct that does not raise a suggestion of an agreement. (*Id.* (quoting *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1026 (10th Cir. 1992) ("The use of antitrust 'buzz words' does not supply the factual circumstances necessary to support [plaintiff]'s conclusory allegations.")).)

Allegations are deemed "conclusory" where they state a legal conclusion without supplying a factual narrative for that conclusion, such that they "amount to nothing more than a 'formulaic recitation of the elements' of a . . . claim". *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (quoting *Twombly*, 550 U.S. at 555). For example, a conclusory allegation in a § 1 claim would state little more than that the defendant joined a conspiracy to unreasonably restrain trade. Here, the Court finds that Plaintiffs have pled non-conclusory factual allegations that Cigna explicitly agreed with the Hospitals and other insurers to penalize physicians providing referrals to Plaintiffs' facilities, and then took those actions in accordance with the agreement. Such allegations suffice to plead an agreement here.

Plaintiffs' SAC here includes specific allegations of Cigna's agreement with the Hospitals and other entities to take action to damage Plaintiffs' businesses. Plaintiffs allege that Cigna representatives joined conspiratorial meetings on May 18, 2012 and August 29, 2012, at which the agreement was confirmed and actions were planned, and that Cigna's participation in the agreement and acts in furtherance thereof were

7

mentioned in e-mails exchanged between co-conspirators in July 2012.  (SAC ¶¶ 172-176.)  These facts support Plaintiffs' express allegations that an agreement existed between Cigna, the Hospitals, and the other alleged co-conspirators.  In addition, the SAC describes actions in furtherance of the conspiracy that Cigna took against specifically identified physicians, and alleges that Cigna's references to contractual breaches as support for those actions was mere pretext, because no breaches actually occurred.  (*Id.* ¶¶ 179-195.)  Thus, Plaintiffs have pled an agreement between the alleged co-conspirators, as well as conduct in furtherance of such agreement.  These are factual, not conclusory, allegations that the Court must take as true when considering Cigna's Motion, and are sufficiently specific to "raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  *See Twombly*, 550 U.S. at 556.  Far from invoking mere antitrust "buzz words", Plaintiffs' allegations include facts that suggest "a conscious commitment to a common scheme designed to achieve an unlawful objective".  *Monsanto*, 465 U.S. at 764.

In support of the Motion, Cigna cites this Court's order in a related case alleging the same underlying conspiracy, in which the Court dismissed the plaintiffs' claims against the insurer defendants.  (ECF No. 61 at 2, 6 (citing *Kissing Camels Surgery Ctr., LLC v. Centura Health Corp.*, 2014 WL 560462 (D. Colo. Feb. 13, 2014)).)  However, in *Kissing Camels*, the plaintiffs had only alleged that the Hospitals conspired to pressure the insurer defendants, not that the insurers actually *agreed* with the Hospitals to join the conspiracy.  *Kissing Camels*, 2014 WL 560462, at *8.  The *Kissing Camels* plaintiffs attempted to rely on allegations of parallel conduct to raise an

8

inference of a preceding agreement, but also explicitly noted the insurers' alternative reasons for the parallel actions they took, and failed to allege that such reasons were baseless or pretextual.  *Id.* at *9.  Because the plaintiffs' allegations established neither an overt agreement nor a reasonable inference thereof, the Court found the allegations insufficient to plead a § 1 claim against the insurers.  *Id.*  The specific allegations of facts evidencing an agreement discussed above, such as the referenced meetings and e-mails, materially distinguish this case from *Kissing Camels*.

Cigna raises two additional arguments in its Motion, contending that its actions against the physicians can be justified by Plaintiffs' violation of Colorado statute, and that those actions in 2013 were too attenuated to be linked to the meetings in 2012 at which the agreement was confirmed.  (ECF No. 61 at 8-12.)  Cigna likely intends these arguments to diminish the reasonableness of the inference that its alleged parallel conduct was the result of a preceding agreement in violation of § 1.  However, Plaintiffs have sufficiently pled an overt agreement, and are not relying solely on a reasonable inference from parallel conduct.  *See Twombly*, 550 U.S. at 557.  Because the Court must take Plaintiffs' factual allegations as true and view them in the light most favorable to Plaintiffs on a Motion to Dismiss, the Court finds Cigna's arguments unpersuasive at this stage.  *See Ridge at Red Hawk*, 493 F.3d at 1177.  Though these arguments suggest that the alleged conspiracy is less likely, they do not render Plaintiffs' allegations implausible, and thus do not mandate dismissal.  *See Twombly*, 550 U.S. at 556.

Accordingly, the Court finds that Plaintiffs have alleged sufficient facts showing that Cigna entered into an agreement with the Hospitals and others, and the Motion is denied as to this argument.

## B.   Unreasonable Restraint of Trade

While § 1 of the Sherman Act prohibits agreements in restraint of trade, it is not read so broadly as to render "every conceivable contract or combination which could be made concerning trade or commerce . . . anywhere in the whole field of human activity to be illegal". *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 60 (1911).  Rather, § 1 prohibits only those agreements that impose unreasonable restraints of trade, which is determined under one of two analyses: the *per se* illegality test, or the "rule of reason" test.  *See Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1016 (10th Cir. 1998).

If "a practice is identified as illegal *per se*, a court need not examine the practice's impact on the market or the procompetitive justifications for the practice before finding a violation of antitrust law." *Id.*  However, if the practice is not *per se* illegal, courts apply the rule of reason test, which involves a burden-shifting analysis to determine the extent to which the practice has unreasonably anticompetitive effects.  *Id.* at 1017.  A *per se* illegal practice under § 1 escapes the burden-shifting analysis because "certain practices, for example, price fixing, are entirely void of redeeming competitive rationales . . . , [with] no offsetting economic or efficiency justifications salvaging them."  *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 963 (10th Cir. 1994).  "This *per se* approach permits categorical judgments with respect to certain business practices that have proved to be predominantly anticompetitive."  *Nw. Wholesale*

10

*Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985).

Defendants' Motion argues that the conduct alleged in Plaintiffs' SAC does not constitute an unreasonable restraint of trade under either the *per se* test or the rule of reason test.  (ECF No. 61 at 13-15.)  Plaintiffs assert that the *per se* analysis applies because the alleged conduct constitutes a group boycott.  (ECF No. 63 at 11-12.)

"Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category."  *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959).  The Supreme Court has cautioned, however, that "the category of restraints classed as group boycotts is not to be expanded indiscriminately, and the *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor . . . ."  *F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458 (1986).  While there are various models of group boycotts, *see Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 416 (D.D.C. 1988) (collecting cases), a group boycott meriting *per se* status in the Tenth Circuit must involve an agreement among horizontal competitors.  *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1392 (10th Cir. 1992) (quoting *Key Fin. Planning Corp. v. ITT Life Ins. Corp.*, 828 F.2d 635, 641 (10th Cir. 1987) ("While the competitors need not be at the same market level as the plaintiff, there must be concerted activity between two or more competitors at same market level.")).  Other factors supporting a finding of a *per se* illegal group boycott include whether the conspiring parties "possess[] market power or exclusive access to an element essential to effective competition", and whether the challenged practices are "justified by

11

plausible arguments that they were intended to enhance overall efficiency and make markets more competitive." *Nw. Wholesale Stationers*, 472 U.S. at 294-95.

Cigna argues that Plaintiffs' SAC contains no specific factual allegations that Cigna conspired with its competitors, and that its conduct in fact had procompetitive benefits.   (ECF No. 61 at 14.)  Cigna does not, however, contest Plaintiffs' allegations that the Hospitals have significant market power, which they have used to convince insurers like Cigna to join in their conspiracy.  (SAC ¶¶ 158-160.)

On review of the allegations in the SAC, the Court finds that the alleged conduct here fits the model of a group boycott involving a vertical combination as well as horizontal collusion.  Plaintiffs allege that "two dominant hospital systems," Centura and HCA, used their market power to convince Cigna and the other predominant insurers in the relevant geographic market, including Aetna, Kaiser Foundation Health Plan of Colorado, Anthem Blue Cross and Blue Shield of Colorado, and UnitedHealthcare of Colorado, to join in a conspiracy against Plaintiffs.  (SAC ¶¶ 155-56.)  Pursuant to the conspiracy, the Hospitals convinced the insurers not to do business with Plaintiffs, and to put pressure on physicians doing business with Plaintiffs by paying them lower rates and terminating, or threatening to terminate, their contracts with the insurers.  (*Id.* ¶¶ 161-64.)  The insurers' actions against these physicians had the effect of reducing Plaintiffs' business, as well as limiting patients' choices for care.  (*Id.* ¶¶ 163-65.)

These allegations include collusion by the Hospitals, two dominant entities in the market which compete on the same level, to limit Plaintiffs' ability to compete with them for outpatient surgical services by depriving Plaintiffs of patient referrals through punitive actions taken by the insurers against physicians providing those referrals.

12

Thus, the conspiracy includes horizontal collusion by multiple entities with market power to deprive Plaintiffs of customers, and fits the model of a group boycott. *See Ind. Fed'n of Dentists*, 476 U.S. at 458.

Cigna alleges that its actions against physicians had procompetitive effects that make *per se* treatment inappropriate, including "ensuring compliance with state law and ERISA plan terms, protecting Cigna's provider network against fee forgiving, and lowering costs to its plans." (ECF No. 61 at 14.) While ensuring compliance with legal and contractual requirements are legitimate aims that may serve to justify Cigna's actions, Cigna has failed to explain any benefits to competition resulting from such actions. On its face, Cigna's contention that its actions "lower[] costs to its plans" could arguably be a procompetitive benefit, but on closer inspection, the alleged decrease in costs inures to Cigna's benefit, not that of patients or medical providers. Cigna explains that it pays less when reimbursing in-network claims, such as those arising from the Hospitals' facilities, than when reimbursing out-of-network claims arising from Plaintiffs' facilities. (ECF No. 61 at 12.) Cigna's explanation, and the cases it cites, support a finding that it had economically rational motives for its actions against physicians, but do not show that Cigna's actions to reduce its own costs resulted in any benefits to competition.[2] Instead, taking Plaintiffs' allegations as true, Cigna's actions reduced

---

[2] In *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1263 (10th Cir. 2006), the court made reference to the defendant's "procompetitive justification for limiting the number of paneled health care providers", which the defendant argued increased the volume of patients each provider sees, allowing it to negotiate lower reimbursement rates to those providers. Cigna cites *Abraham* for the proposition that lowering reimbursement rates has been recognized as procompetitive. (ECF No. 61 at 12.) The Court disagrees with Cigna's reading, as *Abraham* referred to this alleged "procompetitive justification" in the context of the first prong of a § 1 claim to determine whether the defendant "may have acted independently" rather than creating an inference of conspiracy. *See Abraham*, 461 F.3d at 1263. The *Abraham* court was

13

patient choice and prevented Plaintiffs from fairly competing with the Hospitals to provide outpatient surgical procedures.

After considering the requisite factors, the Court finds that Plaintiffs have sufficiently pled that Cigna's actions in furtherance of the conspiracy with the Hospitals caused a group boycott that may be considered *per se* illegal under § 1. *See Nw. Wholesale Stationers*, 472 U.S. at 294-95. Accordingly, Plaintiffs have successfully pled an unreasonable restraint of trade, and the Court need not consider Cigna's argument under the rule of reason analysis. As Cigna has failed to present any basis on which to dismiss Plaintiffs' antitrust claims, the Motion is denied.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS that Cigna's Motion to Dismiss Counts VI and VII of Plaintiffs' Second Amended Complaint (ECF No. 61) is DENIED.

Dated this 20th day of February, 2015.

BY THE COURT:

_____
William J. Martinez
United States District Judge

---

not, as here, evaluating the second prong of a § 1 claim to determine whether the conspiracy unreasonably restrained trade. As such, the *Abraham* court did not make a finding that the defendant's proffered justification was, in fact, procompetitive. *Id.*